KRISTIN W. MURNAHAN (Georgia Bar No. 759054)
murnahank@sec.gov
M. GRAHAM LOOMIS (Georgia Bar No. 457868)
loomism@sec.gov

Securities and Exchange Commission
950 E. Paces Ferry Road, NE
Suite 900
Atlanta, GA 30326
Tel: (404) 842-7600
Fax: (404) 842-7666

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>QUEST EDUCATION L.L.C., DANIEL BLUE, DAVID CHRISTOPHER WHITE, and KEITOH JORDAN SPEARS,<br><br>　　　　　Defendants | Case No.:<br><br>**COMPLAINT** |

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges as follows:

## SUMMARY

1. This case arises out of the participation in the unregistered offer and sale of securities by Quest Education L.L.C. ("Quest"), its principal, Daniel Blue ("Blue"), and its employees, David Christopher White ("White") and Keitoh Jordan Spears ("Spears").

2. From October 2019 through at least April 2023 (the "Relevant Period"), Quest received approximately $2.5 million in commissions—more than 50% of its revenue during that period—from at least eight issuers (the "Securities Issuers") in exchange for soliciting Quest customers to invest in the Securities Issuers' unregistered securities offerings.

3. Quest touted itself as an investor education company that assisted its customers in setting up self-directed IRAs and 401(k)s so that they could invest in alternative investments.

4. A key component of Quest's business model, and its largest revenue-driver, was presenting its customers with investments issued by entities that paid commissions to Quest.

5. These entities typically paid Quest commissions of up to seven percent of the amount invested by Quest customers.

6. Defendant Blue often worked closely with the entities to understand their business models and funding needs so that Quest could more effectively market the entities' investment opportunities.

7. In presenting investment opportunities to its customers, Quest—usually through Defendants White and Spears—discussed the entities and the investment opportunities, often vouching for the legitimacy of the entities and/or their principals.

8. Quest also sometimes distributed marketing materials to its customers, including interviews conducted by Blue with three of the Securities Issuers' principals.

9. When Quest customers, some of whom were not accredited investors, decided to invest with entities that paid Quest commissions, Quest processed the paperwork necessary to authorize the transfer of funds from its customers' self-directed IRAs and 401(k)s to the entities.

10. Quest paid White and Spears a portion of the commissions received from the entities when their customers purchased the entities' securities.

11. Specifically, White and Spears received a commission of up to one percent on any security purchased by their respective Quest customers, with each receiving over $200,000 in commissions between October 2019 and March 2024 in connection with their customers' investing with the Securities Issuers.

12. At all relevant times, Defendants were not registered as brokers or dealers with the Commission nor associated with a broker or dealer registered with the Commission.

13. None of the Securities Issuers' offerings were registered with the Commission.

14. By engaging in this conduct, as further described herein, Defendant Quest violated and, unless restrained and enjoined by this Court, may continue to violate Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) & 77e(c)]; and Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)].

15. By engaging in this conduct, as further described herein, Defendant Blue violated and, unless restrained and enjoined by this Court, may continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & 77e(c)];

and, both directly and as a control person of Quest, Sections 15(a)(1) and 20(a) of the Exchange Act [15 U.S.C. §§ 78o(a)(1) & 78t(a)].

16. By engaging in this conduct, as further described herein, Defendant White violated and, unless restrained and enjoined by this Court, may continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & 77e(c)]; and Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

17. By engaging in this conduct, as further described herein, Defendant Spears violated and, unless restrained and enjoined by this Court, may continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & 77e(c)]; and Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## JURISDICTION AND VENUE

18. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) & 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) & 78u(e)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil monetary penalties, and such other and further relief as this Court may deem just and appropriate.

19. Defendants were involved in the offer and sale of securities, as that term is defined under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

20. Defendants, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce in connection with the conduct alleged herein.

21. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

22. This Court has subject matter jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) & 77v(a)]; Sections 21(d) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d) & 78a(a)]; and 28 U.S.C. § 1331.

23. Venue in this District is proper because Defendants transacted business in the District of Nevada and because one or more acts or transactions constituting the violations alleged herein occurred in the District of Nevada.

## DEFENDANTS

24. **Quest Education L.L.C.** is a Nevada limited liability company headquartered in Las Vegas, Nevada, which is owned by Blue (99%) and his wife (1%), and controlled by Blue. Quest described itself as a financial education company whose customers include individuals with self-directed IRAs and solo 401(k) accounts. Quest has never been registered with the Commission in any capacity.

25. **Daniel Blue**, age 34, is a resident of Las Vegas, Nevada. Blue is the principal of Quest and also owns Blue Consulting LLC. Blue has never been associated with any entity registered with the Commission and has never held any securities license. Blue filed for Chapter 7 bankruptcy in the District of Nevada on August 1, 2024 (Bankr. D. Nev., No. 2:24-bk-13962-hlb).

26. **David Christopher White**, age 53, is a resident of Las Vegas, Nevada. White was employed by Quest as an Account Executive. White has never been associated with any entity registered with the Commission and has never held any securities license.

27. **Keitoh Jordan Spears**, age 29, is a resident of Las Vegas, Nevada. Spears was employed by Quest as an Account Executive. Spears has never been associated with any entity registered with the Commission and has never held any securities license.

# RELATED ENTITIES

28. **MJF Holdings, LLC** ("MJF Holdings") was a Nevada limited liability company headquartered in Pendleton, South Carolina, which was wholly owned and controlled by Michael French ("French"). MJF Holdings paid $1.4 million in commissions to Quest in connection with investments in MJF Holdings and MJF Capital, LLC (a predecessor entity to MJF Holdings). MJF Holdings has never been registered with the Commission in any capacity. On April 3, 2023, the Commission charged MJF Holdings, MJF Capital, and French with violating the federal securities laws by engaging in an offering fraud in an enforcement action filed in the Northern District of Georgia. *SEC v. French, et al.*, 1:23-cv-01443-JPB. On April 19, 2023, the court entered consent orders imposing injunctive and other non-monetary relief. On April 30, 2024, the Court ordered French, MJF Holdings, and MJF Capital to pay $14,750,990 in disgorgement and prejudgment interest and ordered French to pay a civil penalty in the amount of $6,200,000.

29. **Issuer 2** is a Nevada limited liability company headquartered in Las Vegas, Nevada. Issuer 2 and affiliated entities involved in real estate development projects paid commissions to Quest in connection with investments in certain real estate projects ("Issuer 2 Entities"). Issuer 2 has never been registered with the Commission in any capacity. The Issuer 2 Entities for which Issuer 2 solicited investor funds filed notices of exempt offerings of securities using SEC Form D.

30. **Issuer 3** is an Ohio limited liability company headquartered in Columbus, Ohio. Issuer 3 paid commissions to Quest. Issuer 3 has never been registered with the Commission in any capacity.

# FACTUAL ALLEGATIONS

**A. Overview of Quest's Business**

31. Quest was formed in 2017 by Blue, who controls every aspect of Quest's business.

32. Although Quest was formed in 2017, it did not begin operations until the summer of 2018.

33. Until that time, Blue worked for a company called iSelfDirect, LLC, whose principal, Benjamin Williams ("Williams"), entered into settled administrative and cease-and-desist proceedings with the Commission in 2022. *See In the Matter of Benjamin D. Williams*, Sec. Act Rel. No. 11024 (Jan. 21, 2022).

34. The Commission's Order in the proceedings found, among other things, that Williams acted as an unregistered broker in connection with unregistered oil and gas debt and equity securities offerings sponsored by two entities.

35. During the Commission's earlier investigation of Williams, Quest took over iSelfDirect's customers.

36. Quest touted itself as an education company that provided individuals guidance on establishing their 401(k) accounts and IRAs.

37. Quest also provided individuals with alternative investment options for their 401(k) accounts and IRAs.

38. Among other things, Quest claimed to educate its customers on how to set up solo 401(k)s and self-directed IRAs with companies specializing in those types of accounts ("Custodians"), which Quest represented would allow its customers to invest retirement money in alternative investments.

39. Quest provided its services to more than 900 customers throughout the United States.

40. Quest generated revenues from a variety of sources.

41. Quest received one-time payments from customers when they signed up with Quest.

42. Quest also received payments from the Custodians at which Quest customers set up their accounts.

43. Additionally, Quest received commissions—which Quest called "referral fees"—paid by entities, including the Securities Issuers, when Quest customers invested in their offerings.

44. Commissions paid by the entities were by far Quest's single largest source of revenue during the Relevant Period.

45. When new customers signed up for services provided by Quest, they were required to sign three documents memorializing the relationship and the agreement between the parties.

46. The documents each provided disclaimers, including: "We are not a registered broker, dealer, analyst, or adviser"; "Company is not a registered broker, dealer . . ."; and "[a]t Quest Education, LLC, we do **NOT**: . . . Give investment advice[,] Determine the Suitability of Investments [or] Prepare investment documents . . . ."

47. Quest's business practices deviated substantially from these disclaimers.

**B. Quest and Its Employees' Receipt of Transaction-Based Compensation**

48. A core component of Quest's business was presenting its customers with alternative investments (such as promissory notes and limited liability company membership interests) offered by entities that paid Quest commissions on investments made by Quest's customers.

49. It was advantageous for Quest to have as many of its customers as possible invest in the entities' offerings.

50. Quest customers' investment in the entities' offerings increased Quest's revenue because Quest received commissions as high as 7% of the value of each investment.

51. Hundreds of Quest customers invested in the alternative investments offered by the entities that paid Quest commissions on investments made by Quest's customers.

52. Payments from the entities made up a substantial portion of Quest's revenue.

53. Without these revenues, Quest would have found it difficult to survive as a company.

54. During the Relevant Period, Quest received approximately $2.5 million in commissions—comprising more than 50% of its revenue—in connection with investments made by Quest customers in the Securities Issuers, including MJF, Issuer 3, and several Issuer 2 Entities.

55. White and Spears also received commissions, which were paid to them by Quest when their individual customers invested in the Securities Issuers' offerings.

56. The commissions paid to White and Spears were a portion of the commissions paid to Quest by the Securities Issuers.

57. White and Spears received up to one percent, but typically less, of the amounts that their customers invested with the Securities Issuers.

58. Between October 2019 and March 2024, White and Spears each received more than $200,000 in connection with their customers' investing with the Securities Issuers.

59. Quest's compensation structure incentivized employees to push certain investments.

60. Blue was solely responsible for identifying the Securities Issuers, negotiating agreements with the Securities Issuers, and understanding the Securities Issuers' business models and funding needs.

61. Blue also directed White and Spears to solicit investors, approved commission payments to them, and provided them with lists of Quest customers to solicit.

62. In some instances, Blue assisted in the development of marketing materials that White and Spears ultimately distributed to Quest customers.

**C. The Investments Offered by the Securities Issuers**

63. Most of the investments issued by the Securities Issuers were unsecured promissory notes.

64. The interest promised by the notes typically ranged from 8% to 12% annually, and the maturities typically ranged from 12 to 60 months.

65. The following Securities Issuers issued promissory notes: MJF Capital; MJF Holdings; Issuer 3; and one of the entities affiliated with Issuer 2.

66. The promissory notes are securities subject to the federal securities laws.

67. The promissory note investors were motivated by an expected return on their investment of between 8 and 12 percent per annum.

68. Each promissory note offering was made broadly to prospective investors throughout the country over the course of months or years.

69. Quest and the Securities Issuers marketed the promissory notes as investments, suitable for investment through self-directed retirement accounts, leading investors to reasonably believe that this was an investment opportunity.

70. The promissory notes were not subject to the authority of any regulatory body other than the Commission.

71. There are no other risk-reducing factors that would make application of the federal securities laws to the promissory notes unnecessary.

72. The remaining investments, issued by the entities affiliated with Issuer 2, were passive limited liability company membership interests.

73. These Securities Issuers sold preferred membership interests that provided set annual rates of return with the expectation of regular interest payments and did not provide investors with the right to participate in the management of the companies.

74. Both the promissory notes and the limited liability company membership interests are investment contracts and are subject to the federal securities laws.

75. All investments at issue in this case were presented to Quest customers as investment opportunities suitable for self-directed retirement accounts.

76. Each Securities Issuer pooled investor funds.

77. None of the investments provided investors with any meaningful role in the purported business activities of the Securities Issuers.

78. Investors relied entirely on the Securities Issuers to generate returns.

79. None of the securities offerings of the Securities Issuers for which Quest and the individual defendants solicited investments were registered with the Commission.

80. None of the securities offerings of the Securities Issuers for which Quest and the individual defendants solicited investments qualified for an exemption from registration with the Commission.

81. Defendants recommended and facilitated the sale of several Securities Issuers' securities to unaccredited investors, including the securities of MJF Holdings, Issuer 2 Entities, and Issuer 3.

### D. Quest's Participation in the Securities Issuers' Offerings

82. Quest made multiple disclaimers in its customer paperwork concerning the scope of its services.

83. Quest claimed that it did not give investment advice.

84. Quest also claimed that it did not determine the suitability of investments.

85. Additionally, Quest claimed that it did not prepare investment documents.

86. Contrary to these claims, however, and consistent with Quest and its employees' receipt of commissions, Defendants promoted the Securities Issuers' offerings.

87. Initially, Blue decided which Securities Issuers to work with and which offerings Quest would promote to its customers.

88. Blue communicated with the Securities Issuers' principals to obtain information about the Securities Issuers and their funding needs, as well as the principals' backgrounds.

89. For example, Blue communicated frequently with Issuer 2's principals regarding the Issuer 2 Entities' offerings, including communications about specific funding targets that Issuer 2 expected Quest to raise.

90. Blue felt significant pressure to raise the target amounts that Issuer 2 expected Quest to raise.

91. Blue also conducted recorded interviews with the principals of MJF Holdings, Issuer 2, and Issuer 3 so that Quest could provide the interview recordings to customers who asked for additional information in making investment decisions.

92. After Blue decided to work with a Securities Issuer and Quest entered into a referral fee agreement with the Securities Issuer, Blue provided information about the Securities Issuer to Spears and White.

93. After receiving information about the Securities Issuer from Blue, Spears and White reached out to Quest customers about the investment opportunity.

94. For example, White and Spears scheduled "account reviews" with individuals who appeared on an internal Quest list as having cash available to invest.

95. During those reviews, which ostensibly were meant to discuss the customers' plans for the money, White and Spears frequently suggested that their customers consider investing in the Securities Issuers' offerings.

96. When customers expressed interest, White and Spears put them in contact with Securities Issuer representatives.

97. To facilitate communications between Quest customers and the Securities Issuers, Quest employees, including White and Spears, scheduled phone calls between customers and the Securities Issuers.

98. Quest employees, including White and Spears, provided the Securities Issuers notes about customers.

99. Quest employees, including White and Spears, tracked customer interactions with the Securities Issuers, and/or followed up with customers after the customers' phone calls with the Securities Issuers.

100. Defendants promoted specific investments to Quest customers.

101. In an email with MJF Holdings' principal, French, Blue stated that he wanted to "pump you up to the people we are sending you like we do with [another Issuer's principal] and his real estate."

102. Texts between Blue and French also reflect Blue's desire to "pump up" French.

103. Similarly, White told French in an email concerning an investor that White "really pumped you up."

104. White stated in an email to French that "I just got [off] the phone with [the investor] and her sister-in-law was holding her up because she thought it was a scam. I told her I loved everyone on MJF's team and really enjoy working with them. [The investor] said Ok I trust you and I will send them the paperwork . . . ."

105. Spears stated in an email to French that an investor "feels confident in [Q]uest introducing you two. She asks good questions but she shouldn't have too many questions since we discussed most of them on the phone today."

106. Spears stated in an email to Issuer 2 personnel ahead of a phone conversation between the investor and Issuer 2 that he had "been pitching you guys for months but [the investor] didn't have enough liquid."

107. In a June 12, 2020 text exchange, Blue told French that "We are sending an email to all of our clients . . . Pimping out our third party companies like you."

108. Multiple Quest customers stated that Quest, primarily through White and Spears, vouched for the Securities Issuers and their principals.

109. These customers also said that Quest, primarily through White and Spears, "push[ed]" investments and described them as "good investments."

110. White and Blue told investors that they had invested their own funds in order to convince customers to invest.

111. White and Spears vouched for the Securities Issuers and their principals.

112. White and Spears also told their customers that the Securities Issuers' offerings were good investment opportunities.

113. White and Spears provided hesitant customers with the recorded interviews conducted by Blue.

114. Blue knew that Quest customers trusted Quest and its representatives.

115. Blue knew that customers would rely on their favorable statements about the Securities Issuers and their principals.

116. Blue knew that Quest customers "loved" Quest because of the human connection that the customers had with Quest personnel and the relationships that they had built.

**E. Blue's Role in MJF Holdings' Offering**

117. Blue also played a significant role in MJF Holdings' offering.

118. Before MJF Holdings launched its offering, Blue consulted with French regarding MJF Holding's business model, corporate structure, and the payment terms of MJF Holdings' promissory notes.

119. Blue and French discussed how the payments terms of MJF Holdings' promissory notes should be structured, and Blue advised French to make quarterly interest payments.

120. Blue also provided French with a sample promissory note from another Issuer's offering to use for purposes of MJF Holdings' offering.

121. After MJF Holdings launched its offering, Blue proposed an interview with French to provide information about MJF Holdings to Quest customers.

122. Blue drafted the questions for the interview and recorded it.

123. Blue provided the recorded interview of French to Spears and White as a resource to send to Quest customers who had questions about MJF Holdings.

124. French made material misstatements throughout the interview about, among other things, French's professional credentials, MJF Holdings' average return on investment, and the safety of investments in MJF Holdings.

**F. Quest's Completion of Investment Related Paperwork for its Customers**

125. Quest generally did not complete, or communicate with customers concerning, paperwork provided by the Issuers (*e.g.*, promissory notes, subscription agreements, investor questionnaires).

126. Quest did, however, complete, or at least facilitate the completion of, paperwork necessary for the investments to be held in self-directed IRAs and solo 401(k)s.

127. For example, Quest instructed the Securities Issuers as to which documents needed to be completed by investors to hold investments in self-directed IRAs and solo 401(k)s, and even pre-populated certain information within the documents.

128. Quest then received completed investment paperwork—including underlying investment agreements—from the Securities Issuers, forwarded the paperwork to the IRA and 401(k) Custodians, and sometimes facilitated corrections requested by the Custodians.

129. While a customer technically could submit investment paperwork to the Custodians directly, Quest preferred to receive paperwork prior to submission to prevent mistakes and unnecessary back-and-forth between the parties.

130. It was the expectation of Quest, the Securities Issuers, the Custodians, and Quest customers that Quest would manage and submit this investment paperwork.

**CONCLUSION**

131. Defendants engaged in the conduct described above despite not being registered with the Commission in any capacity.

132. As a result of the conduct described above, Quest received approximately $2.5 million in commissions—comprising more than 50% of its revenue—from the Securities Issuers during the Relevant Period.

133. As a result of the conduct described above, White and Spears each received more than $200,000 in commissions between October 2019 and March 2024 from commissions paid to Quest by the Securities Issuers.

## FIRST CLAIM FOR RELIEF

## Violations of Sections 5(a) and 5(c) of the Securities Act

## [15 U.S.C. §§ 77e(a) and 77e(c)]

## [ALL DEFENDANTS]

134. The Commission re-alleges and incorporates by reference the allegations contained in Paragraphs 1-133, above, as if they were fully set forth herein.

135. Defendants Quest, Blue, White, and Spears, and each of them, by engaging in the conduct described above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, offered to sell or sold securities or, directly or indirectly, or carried such securities through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

136. No registration statement has been filed with the Commission or has been in effect with respect to these securities.

137. By reason of the forgoing, Defendants Quest, Blue, White, and Spears, and each of them, directly or indirectly, violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SECOND CLAIM FOR RELIEF

**Violations of Section 15(a)(1) of the Exchange Act**

**[15 U.S.C. § 78o(a)(1)]**

**[ALL DEFENDANTS]**

138. The Commission re-alleges and incorporates by reference the allegations contained in Paragraphs 1-133, above, as if they were fully set forth herein.

139. Defendants Quest, Blue, White, and Spears, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase and sale of, securities without being registered as a broker or dealer with the Commission or associated with a broker-dealer registered with the SEC.

140. By reason of the foregoing, Defendants Quest, Blue, White, and Spears violated and, unless restrained and enjoined, will continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## THIRD CLAIM FOR RELIEF

**Liability under Section 20(a) of the Exchange Act for Defendant Quest's Violation of Section 15(a) of the Exchange Act**

**[15 U.S.C. § 78t(a)]**

**[DEFENDANT BLUE]**

141. The Commission re-alleges and incorporates by reference the allegations contained in Paragraphs 1-133, above, as if they were fully set forth herein.

142. Pursuant to Section 20(a) of the Exchange Act, Defendant Blue by, directly or indirectly, controlling Defendant Quest is liable for its violation of Section 15(a) of the Exchange Act.

# PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

## I.

Permanently restraining and enjoining each Defendant from, directly or indirectly, engaging in conduct in violation of Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] and Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)];

## II.

Permanently restraining and enjoining Defendant Blue from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts;

## III.

Enter an order directing Defendants to disgorge all ill-gotten gains received during the period of violative conduct and to pay prejudgment interest on such ill-gotten gains.

## IV.

Enter an order directing Defendants, and each of them, to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Enter an order holding Defendant Blue jointly and severally liable as a control person of Quest for any disgorgement, prejudgment interest, and civil penalty ordered against Quest for violating Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].


**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

**JURY TRIAL DEMAND**

The Commission hereby demands a jury trial as to all issues so triable.

This 17th day of January, 2025.

/s/Kristin W. Murnahan
Kristin W. Murnahan
Georgia Bar No. 759054
murnahank@sec.gov

/s/M. Graham Loomis
M. Graham Loomis
Georgia Bar No. 457868
loomism@sec.gov

<u>Counsel for Plaintiff</u>

United States Securities and Exchange Commission
950 E. Paces Ferry Road, NE
Suite 900
Atlanta, GA 30326
(404) 842-7600